OPINION
{¶ 1} Ronald Eugene Harris II was convicted by a jury in the Champaign County Court of Common Pleas of four counts of felonious assault, each with a firearm specification, one *Page 2 
count of improperly discharging a firearm at or into a habitation, and two counts of having weapons while under disability. Harris was sentenced to an aggregate term of twelve years in prison and ordered to pay a fine of $300, plus court costs and legal fees. Harris, pro se, appeals from his conviction and sentence. For the following reasons, the judgment will be affirmed.
 I {¶ 2} The state's evidence established the following facts.
 {¶ 3} On May 14, 2006, Harris was moving his residence from 340 Hill Street in Urbana, Ohio, to 345 Hill Street, a different house on the same street where his cousin, Ronald Lanelle Honore, lived. Anthony Artis along with his wife and two children lived in the house across the street from Honore at 346 Hill Street.
 {¶ 4} In the afternoon on May 14, 2006, Honore was walking to his girlfriend's home when he observed Harris, Brian Adams, Terrence Johnson and Michael Hodge at Harris's house at 340 Hill Street. Honore saw that Harris was angry, and he heard Harris tell Brian Adams to leave. Nolan Adams, Jr. ("Adams"), who was Brian's brother, heard about this altercation and decided to "find out what was going on."
 {¶ 5} At 5:30 p.m., Adams drove to 345 Hill Street in his father's gray Ford F250 pickup truck and knocked on the front door. Harris opened the door approximately six inches, told Adams to "get off my property," and slammed the door before Adams had a chance to say anything. Adams returned to his truck. As Adams was starting the vehicle, he heard the sound of metal tapping metal and heard glass from the light post break. Adams looked up and saw Harris shooting at him through a broken window. The truck sustained a bullet hole in the driver's side door frame and two dents where other bullets struck the truck. Another bullet *Page 3 
struck Artis's home across the street. Adams drove to his aunt's home on East Reynolds Street and called 911.
 {¶ 6} On May 18, 2006, Harris was indicted with five counts of felonious assault with a firearm specification, one count of improperly discharging a firearm at or into a habitation, and two counts of having weapons while under disability. A jury trial was held on October 12-13, 2006. The jury acquitted Harris of one count of felonious assault. He was convicted of all other charges and was sentenced accordingly.
 {¶ 7} Harris appeals, raising six assignments of error. We will address them in an order that facilitates our analysis.
 II {¶ 8} Harris's first assignment of error states:
 {¶ 9} "APPELLANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, WHEN THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO ALLOW THE APPELLANT TO TERMINATE HIS APPOINTED COUNSEL AND OBTAIN NEW APPOINTED COUNSEL."
 {¶ 10} In his first assignment of error, Harris claims that the trial court abused its discretion when it denied his request for new court-appointed counsel.
 {¶ 11} "An indigent defendant has a right to competent representation by his court-appointed attorney, but he has no right to have a particular attorney represent him, and must demonstrate `good cause' to warrant substitution of court-appointed counsel. State v. Coleman,2004-Ohio-1305, Montgomery App. No. 19862, ¶ 23. `Good cause' for this purpose includes a complete breakdown in communication between attorney and client. Id. Hostility, *Page 4 
disagreement over trial tactics, tension, or personal conflicts between attorney and client are insufficient to justify a change in appointed counsel when they do not interfere with the preparation and presentation of a competent defense. Id. at ¶ 25." State v. Lewis, Greene App. No. 2005-CA-66, 2006-Ohio-4402, ¶ 56.
 {¶ 12} When considering motions for new counsel, the trial court must weigh "any potential prejudice to a defendant against concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice." State v. Hicks, Greene App. No. 2005-CA-140, 2006-Ohio-6662, ¶ 24, quoting State v. Unger (1981), 67 Ohio St.2d 65, 67, 423 N.E.2d 1078. The trial court's decision on a request for new counsel is reviewed under an abuse of discretion standard.
 {¶ 13} Harris and his attorney first informed the court that Harris desired new counsel at the July 6, 2006 pretrial conference. Harris's counsel stated "that there is not at all a meaningful attorney/client relationship — one that would permit me to be an effective representative of Mr. Harris." When asked to explain why he wanted a new attorney, Harris explained that he was not guilty of the offense and that he "felt that there should be a motion by the attorney to summarize that and that the Prosecutor [should] basically drop the charges." Harris stated that he did not think that his counsel was effectively presenting his version of events to the prosecutor. Harris complained that his counsel had not questioned other people and had advised Harris to take a plea. The trial court denied Harris's motion, stating: "The Court believes from the statements of counsel and the Defendant that there may be disputes regarding trial strategy. Such disputes are not sufficient to demonstrate a breakdown of the relationship to the degree to justify new court-appointed counsel." The court told Harris that his counsel had a duty to provide an *Page 5 
"honest appraisal" of the case and not to present false optimism. The court suggested to Harris that he cooperate with his counsel.
 {¶ 14} At the September 25, 2006 competency hearing, Harris's counsel informed the court that he believed the attorney-client relationship was "irretrievably broken down." Counsel indicated that Harris had under-reported the number of meetings between himself and counsel when speaking with the competency evaluator. Counsel further stated that, during a meeting with Harris on the previous day, Harris had shouted loudly and used expletives, leading corrections officers to call twice to see if counsel needed assistance. Harris's attorney stated that he was not sure "in [his] own mind" whether he could zealously represent Harris. Harris also requested new counsel, stating inarticulately that there were conflicts over the filing of motions, including the competency motion. The trial court again overruled the motion for new counsel, reasoning that Harris had not demonstrated a breakdown in the attorney-client relationship "to such a degree as to endanger [Harris's] rights to effective assistance of counsel."
 {¶ 15} Although Harris and his attorney twice expressed a breakdown in the attorney-client relationship, we cannot conclude that the trial court abused its discretion in denying the motions for new counsel. In the first instance, the trial court apparently believed the lack of effective communication between Harris and his counsel resulted from Harris's unreasonable expectation that his counsel should convince the prosecutor to dismiss the charges. The court disabused Harris of this notion and suggested to Harris that he cooperate with his lawyer. The trial court's approach was not unreasonable.
 {¶ 16} Harris and his counsel's second request for new counsel was tied to the question of Harris's competency to stand trial. Harris's attorney indicated a belief that Harris could not *Page 6 
assist him in his defense, and his statements to the court suggested that the breakdown in communications was due, in part, to Harris's mental state. The trial court could have reasonably concluded that, if Harris took medication as recommended in the competency evaluation report, there would be no need for new counsel. In fact, the court expressly told counsel that, "if you determine that your client is taking his medication as required and if you continue your efforts and you're going to take the position that you can no longer effectively represent him, then you need put it in writing." We find no abuse of discretion in the court's denial of new court-appointed counsel.
 {¶ 17} The first assignment of error is overruled.
 III {¶ 18} Harris's third assignment of error states:
 {¶ 19} "THE TRIAL COURT MADE PRE-TRIAL RULINGS THAT WERE PREJUDICIAL TO THE DEFENDANT, THESE INCLUDE RULING THAT DEFENDANT/APPELLANT WAS COMPETENT TO STAND TRIAL AFTER REVIEWING AN EVALUATION PREPARED BY THE FORENSIC PSYCHIATRY CENTER, OF WESTERN OHIO, EVEN THOUGH THE REPORT'S DISPOSITION WAS INCONCLUSIVE, AND DIDN'T ALLOW THE DEFENDANT TO RECEIVE A FAIR TRIAL"
 {¶ 20} Harris claims that the trial court erred in proceeding with the trial when his competency was in question. Harris asserts that the competency evaluation was inconclusive, that his counsel did not have an opportunity to address the competency issue, and that the record demonstrated that Harris was not competent during trial. *Page 7 
 {¶ 21} "It has long been recognized that a `person [who] lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial.'" State v. Smith, 89 Ohio St.3d 323, 329,2000-Ohio-166, 731 N.E.2d 645, quoting Drope v. Missouri (1975),420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103; City of Dayton v.Codrea, Montgomery App. No. 21161, 2006-Ohio-4511, ¶ 14.
 {¶ 22} The issue of competency to stand trial is governed by R.C.2945.37. Under that statute, a defendant is presumed to be competent. R.C. 2945.37(G). However, "if, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense, the court shall find the defendant incompetent to stand trial and shall enter an order authorized by section 2945.38 of the Revised Code." Id.
 {¶ 23} R.C. 2945.37(B) provides that "if the issue [of competency] is raised after the trial has commenced, the court shall hold a hearing on the issue only for good cause shown or on the court's own motion." "The right to a hearing rises to the level of a constitutional guarantee when the record contains sufficient `indicia of incompetency' to necessitate inquiry to insure the defendant's right to a fair trial. Objective indications such as medical reports, specific references by defense counsel to irrational behavior, or the defendant's demeanor during trial are all relevant in determining whether good cause was shown after the trial had begun." (Citations omitted.) Codrea at ¶ 15.
 {¶ 24} On July 24, 2006, defense counsel requested a competency evaluation for Harris, *Page 8 
which the trial court granted. Harris was evaluated by Dr. Barbra Bergman on August 11, 2006. Dr. Bergman concluded that Harris was competent to stand trial, but that there was an increasing danger that his "current stable mental state will decompensate" given his noncompliance with prescribed psychotropic medication and the increasing stress of a trial. Dr. Bergman recommended that Harris take psychotropic medication, either voluntarily or at Twin Valley Behavioral Health — Dayton Campus, to maintain his competency.
 {¶ 25} A competency hearing was held on September 25, 2006, during which the trial court asked the parties' positions on Harris's competency. The state indicated that it would accept the competency evaluation report and asked that either of Dr. Bergman's recommendations be ordered. Harris's counsel responded that he questioned Harris's ability to assist in his defense, and he indicated that he had never seen "such a set of recommendations from the forensic center." Upon questioning from the court, Harris indicated that he was willing to take medication at the jail and that the medication would be ready that evening. Based on the competency evaluation report and the representations of counsel, the court concluded that Harris was competent to stand trial. The court further stated that it believed Harris would be taking medication voluntarily. At that time, Harris's counsel reserved the right to request a second competency evaluation if the circumstances warranted.
 {¶ 26} We find no abuse of discretion in the court's September 25, 2006 finding that Harris was competent to stand trial. The court reasonably relied on the psychologist's report that he was currently competent to stand trial as well as Harris's assertion that he would take his prescribed medication.
 {¶ 27} Harris also claims that the trial court should have ordered a second competency *Page 9 
evaluation. In support of this assertion, Harris cites a statement by his counsel during the second day of trial that Harris "is not thinking straight today." The following exchange between counsel and the trial court followed:
 {¶ 28} THE COURT: "The record should reflect that the Defendant is on medications to stabilize his emotional condition. And that he's been on the medication since Tuesday of this week and that Attorney Nau reported prior to trial that he appeared to be reasonably stable, but you think he is not quite as stable today?
 {¶ 29} MR. NAU: "I mean, he's given me some questions throughout this trial, yesterday and starting today, and today's suggested questions are somewhat strange. And my recollection is the medication started a week ago this past Monday or this past Wednesday.
 {¶ 30} THE COURT: "I accept the recollection. * * *"
 {¶ 31} Although the comment by Harris's attorney suggested a negative change in Harris's mental stability, we do not find that the record indicates that Harris was no longer able to understand the proceedings or was unable to assist in his defense. We find no abuse of discretion in the trial court's failure to order a competency evaluation, sua sponte, during trial.
 {¶ 32} The third assignment of error is overruled.
 IV {¶ 33} Harris's fifth assignment of error states:
 {¶ 34} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT, WHEN HE WAS DENIED HIS 4TH, 6TH, AND 14TH, AMENDMENT RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTION, WHEN HIS CONVICTIONS ON ALL OF THE COUNTS OF HIS INDICTMENT WERE NOT SUPPORTED BY SUFFICIENCY OF *Page 10 
THE EVIDENCE AND [WERE] AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 35} In this assignment of error, Harris claims that his convictions were based on insufficient evidence and were against the manifest weight of the evidence.
 {¶ 36} When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. State v.Dennis, 79 Ohio St.3d 421, 430, 1997-Ohio-372, 683 N.E.2d 1096, citingJackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d. 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.
 {¶ 37} In contrast, when a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and *Page 11 
experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin, 20 Ohio App.3d at 175.
 {¶ 38} Upon review of the record, we find ample evidence to support Harris's conviction. Honore testified that his cousin, Harris, was moving into his (Honore's) residence at 345 Hill Street on May 14, 2006, and had been moving in for the past couple of days. Terrence Johnson and Michael Hodge had previously lived with Honore. During the afternoon, Honore saw Harris with Brian Adams, Johnson and Hodge at 340 Hill Street, where Harris had been living. Honore saw that Harris was angry, and he heard Harris tell Brian Adams to leave. Honore went to visit with his girlfriend and did not see Harris again until after the shots were fired.
 {¶ 39} Adams testified that he went to Harris's new address at 345 Hill Street in Urbana to question Harris about the altercation involving Brian, his brother. He stated that Harris opened the door approximately six inches, told Adams to "get off my property," and slammed the door before Adams could respond. Adams further testified that he returned to his truck and heard the sounds of metal hitting metal and of glass breaking. Adams testified that he looked toward the light pole in the front of the yard, he saw Harris standing in the window. Although Adams testified that he did not look at Harris's hand, Adams stated that he "looked him [Harris] right in the eye" and he knew Harris "was firing on me."
 {¶ 40} Adams indicated that he went to the home of his aunt, Idella Adams, and called the police. Idella Adams testified that her nephew came to her home to use the telephone. Idella stated that Adams was very excited and told her that Ronnie Harris had shot at him. At *Page 12 
his aunt's home, Adams saw one bullet hole in a door jamb of the truck and two other dents where bullets had hit the vehicle. Adams and his father both testified that the damage to the truck did not exist prior to going to Harris's home.
 {¶ 41} The police were dispatched to the 300 block of Hill Street and to Idella's home. Officer Michael Hughes went to Reynolds Street and spoke with Adams. Sergeant David Reese initially went to 340 Hill Street, Harris's last known address, but was informed by Hughes a few minutes later that Harris was at 345 Hill Street. After Officer Cooper arrived on Hill Street, Reese and Cooper moved their cruisers to the east and west of 345 Hill Street, blocking the road. Reese testified that he observed a hole in the glass of the front window and a light post with broken glass. Harris exited the front of the residence and was arrested. Reese and Hughes testified that Harris told Reese that he had had an argument with Adams and that he was not going to tell Reese anything about a gun. Reese testified that he had not asked Harris anything about a gun. Reese asked Harris if anyone else was in the house. Harris responded that no one else was there.
 {¶ 42} The police recovered two .22 caliber bullets on the street in front of 345 Hill Street, one which likely hit Adams's truck and one which likely hit the lamp post. Gray paint chips and pieces of plastic molding were also found on the street. Broken glass was located underneath the front window of 345 Hill Street.
 {¶ 43} Artis testified that he received a telephone call while he was visiting his mother a few blocks away. Artis returned home and found police officers on his porch. The officers showed Artis a bullet hole on the front of the house to the left of the door. The state offered into evidence the .22 caliber bullet recovered from the front of 346 Hill Street. After Harris's arrest, *Page 13 
the police obtained a search warrant for the residence. The police again noticed glass around the front window, and the screen for that window contained five small holes that appeared to be bullet holes. Reese testified that the scene indicated that rounds had been fired from the inside of the house. Two bullet casings were located nearby. (The police also located a .22 caliber Mossberg rifle and ammunition in the closet of Honore's bedroom. However, John Heile, a firearm examiner at the Bureau of Criminal Identification and Investigation ("BCI"), testified that the casings and the recovered bullets did not come from the rifle. Andrew McClelland, a latent fingerprint examiner at BCI, testified that the fingerprints on the rifle did not match either Harris, Honore, or Hodge.)
 {¶ 44} Finally, Eric Lease, a parole officer, testified that Harris was convicted of trafficking in counterfeit drugs in 1989, of felony drug abuse in 1990, of aggravated robbery in 1994, and felony drug abuse in 2005, which precluded Harris from having a gun.
 {¶ 45} Upon review of the state's evidence, Harris's convictions were based on sufficient evidence. The evidence indicated that an individual fired approximately five shots toward Adams from the front room of 345 Hill Street. Three bullets hit Adams's truck, one hit Artis's home across the street, and one hit the lamp post. The shots occurred while Adams was leaving the residence, and Adams identified Harris as the shooter. There is no evidence that other individuals were present. There was evidence that Harris's prior convictions precluded him from having a weapon legally. Although Harris asserts that the state failed to establish venue for all offenses, Adams testified that Hill Street is in Champaign County.
 {¶ 46} Harris cites to several alleged deficiencies in the prosecution's case. He argues that there was no direct testimony that he had a gun or fired a gun at Adams, and he notes that *Page 14 
the testimony indicated that he had no motive to commit the offense. Harris points out that the weapon seized from the house did not match the bullet casing located near the window where the shooter allegedly stood. Harris places particular emphasis on the failure of the police to question witnesses and to locate the alleged actual shooter. Harris notes that the police did not perform a gunshot residue test on him or anyone else to determine whether Harris had recently fired a firearm.
 {¶ 47} Based on the record, we cannot conclude that the jury clearly lost its way when it convicted Harris of felonious assault, discharging a firearm into a habitation, and having a weapon while under disability. According to the timetable offered by Lieutenant Garry Kimpel, seven minutes and fifty-two second passed between the initial 911 call and the officers' arrival on Hill Street. Although Harris asserts in his brief that someone could have fled the house before the police arrived, there was no testimony that anyone else had been in the house. Moreover, Officer Cooper testified that he did not see anyone in the area when he arrived at the scene. Honore also testified that he returned home after receiving a telephone call that the police were at his house and he did not see Hodge there. While the jury could have concluded that another individual — the shooter — fled prior to the officers' arrival, the jury apparently credited Adams' testimony that Harris had shot at him.
 {¶ 48} As noted by Harris, Reese testified that he did not conduct a gunshot residue ("GSR") test on Harris, explaining that the test is not accurate. Heile, however, testified that GSR testing is still used. Heile also testified that DNA testing is also done on firearms and that the rifle, the magazine, and that five unfired cartridges were swabbed, but there was no request to do additional testing on those swabs. Although there was evidence that the police could have *Page 15 
done additional testing, the jury nevertheless could have reasonably chosen to credit Adams's direct evidence that Harris was the shooter.
 {¶ 49} Harris also notes that the weapon was never found and that he had no motive to shoot at Adams. Honore testified that the east side of 345 Hill Street was bounded by the factory fence of American Pan and the area behind the house was wooded. Reese indicated that officers searched the area around the property "the best we could" but no weapon was found. Based on the state's evidence, the jury could have reasonably concluded that Harris had disposed of the weapon outside before the police arrived, even though the gun was not found. Based on Harris's behavior toward Adams when Adams came to the door, the jury could have also reasonably concluded that Harris was in a state-of-mind to shoot at Adams, even though Adams could not articulate a reason why Harris would do so. Finally, although Honore testified that Harris "doesn't have guns" and "doesn't mess with them," the jury could have reasonably concluded that Harris, in fact, had a gun at that time.
 {¶ 50} The fifth assignment of error is overruled.
 V {¶ 51} Harris's second assignment of error states:
 {¶ 52} "DEFENDANT/APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF HIS SIXTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTIONAL RIGHTS."
 {¶ 53} In his second assignment of error, Harris asserts that his trial counsel rendered ineffective assistance in seven respects: (1) failing to seek a second opinion on Harris's competency; (2) failing to exercise a peremptory challenge against an employee of a *Page 16 
prosecutor's office; (3) failing to file a motion to suppress; (4) failing to subpoena witnesses; (5) failing to object to "slanderous testimony"; (6) failing to object to the use of an altered 911 recording; and (7) failing to object to Harris receiving a maximum sentence.
 {¶ 54} "In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052. To show deficiency, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Id. Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of effective assistance. Id. The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings. Id. Hindsight may not be allowed to distort the assessment of what was reasonable in light of counsel's perspective at the time. State v. Cook (1992),65 Ohio St.3d 516, 524, 605 N.E.2d 70.
 {¶ 55} "Even assuming that counsel's performance was ineffective, the defendant must still show that the ineffectiveness adversely impacted the judgment. State v. Bradley (1989), 42 Ohio St.3d 136, 142,538 N.E.2d 373. Reversal is warranted only where the defendant demonstrates that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id." State v.Dixon, Montgomery App. No. 21823, 2008-Ohio-755, ¶ 22-23.
 {¶ 56} First, Harris claims that his attorney was ineffective in failing to seek a second competency evaluation. As noted above, Harris's counsel questioned Harris's competency to stand trial and reserved the right to seek a second evaluation depending on the effectiveness of the prescribed medication. Although the record reflects that Harris was a difficult client and that *Page 17 
his mental state was worse during the second day of trial, there is no evidence in the record to demonstrate that he was incompetent before or during trial. Accordingly, there is no evidence that his counsel acted unreasonably in failing to seek a second evaluation or that he would have been found incompetent to stand trial had another evaluation been conducted.
 {¶ 57} Second, Harris claims that his counsel failed to use a peremptory challenge on a prospective juror who was an assistant prosecutor with the Union County Prosecutor's Office. Contrary to Harris's assertion, defense counsel exercised a peremptory challenge to remove the assistant prosecutor from Union County. Harris's claim is without merit.
 {¶ 58} Third, Harris claims that his counsel rendered ineffective assistance when he failed to file a motion to suppress evidence obtained from the house. At trial, the prosecutor disclosed that police officers had entered Harris's home to ensure that no one else was present after Harris's arrest but prior to obtaining a search warrant. The prosecutor indicated that the search warrant affidavit, which is part of the record, did not rely on any information from inside the house.
 {¶ 59} We have held that police officers lacked exigent circumstances to justify a protective sweep of a home when the police had no basis to believe or suspect that anyone else was in the house, even though a firearm may have been inside the residence. State v. Sharpe, Clark App. No. 07CA46, 174 Ohio App.3d 498, 2008-Ohio-267, — N.E.2d-. InSharpe, we also concluded that the inevitable discovery rule was inapplicable because the subsequently-obtained search warrant was based on facts gathered during the prior unlawful warrantless search. Here, regardless of whether the officers' protective sweep may have been unlawful per Sharpe, the fact that the search warrant was based solely on facts obtained apart from the *Page 18 
warrantless search appears to make Sharpe distinguishable. Accordingly, Harris has not demonstrated that a motion to suppress, had it been filed, would have been granted. Harris thus has not established that his counsel was ineffective in failing to file a motion to suppress.
 {¶ 60} Fourth, Harris asserts that his defense counsel was ineffective by failing to subpoena witnesses on his behalf. However, there is no evidence in the record regarding whom Harris wished to subpoena and what those witness would have testified to had they been subpoenaed and appeared as witnesses. We can only speculate whether these witnesses' testimony would have been helpful to Harris. Harris has not demonstrated that the outcome of the trial would have been different but for counsel's failure to subpoena witnesses.
 {¶ 61} Fifth, Harris alleges that his attorney failed to object to "slanderous" testimony, thus denying him a fair trial. Harris cites to testimony by Lease regarding Harris's prior convictions. Because evidence of Harris's prior convictions was necessary for the offenses of having weapons while under disability, Harris's counsel had no reasonable basis to object to that testimony. Counsel was not ineffective for failing to object to Lease's testimony.
 {¶ 62} Sixth, Harris asserts that his attorney failed to object to the state's use of an altered 911 recording. He claims that the "undoctored" version would have shown that Adams lacked credibility. Despite Harris's claim, there is no evidence in the record that the 911 tape used by the state was altered. Accordingly, the record does not support Harris's claim that his counsel was ineffective in this respect.
 {¶ 63} Finally, Harris claims that his counsel should have objected to the court's imposition of maximum sentences. As discussed infra, the court acted within its discretion when it imposed maximum sentences. There is no evidence that Harris would have received a *Page 19 
lesser sentence had his counsel objected.
 {¶ 64} Because Harris has not demonstrated that his counsel rendered ineffective assistance, his second assignment of error is overruled.
 VI {¶ 65} Harris's sixth assignment of error states:
 {¶ 66} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT WHEN IT ALLOWED PROSECUTORIAL MISCONDUCT DURING TRIAL THUS VIOLATING APPELLANT[']S 6TH AND 14th AMENDMENTS UNITED STATES CONSTITUTIONAL RIGHTS."
 {¶ 67} Harris claims that the prosecutor engaged in misconduct when he failed to disclose exculpatory evidence, failed to call certain witnesses, brought in irrelevant evidence, used altered evidence, and improperly argued the evidence. None of Harris's claims has merit.
 {¶ 68} Harris first asserts that the prosecutor engaged in misconduct by concealing the fact that officers performed a protective sweep of the residence prior to the issuance of a search warrant, contrary toBrady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Harris claims that the evidence derived from the search was inadmissible.
 {¶ 69} On the second day of trial, the prosecutor disclosed that Officers Reese and Hughes conducted a protective sweep of 345 Hill Street prior to obtaining a search warrant. The prosecutor stated that the officers "did a quick scan, didn't touch any evidence, didn't look at any evidence. When they realized the house was clear, they went back outside and then * * * began the search warrant process." The prosecutor invited defense counsel to question Officer Hughes, and the court permitted defense counsel the opportunity to discuss the matter with *Page 20 
Harris and Harris's mother, who was present in the courtroom. After discussions with Harris and Harris's mother, defense counsel opted not to "make a legal issue out of the previous search."
 {¶ 70} The prosecution's suppression of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. "[F]avorable evidence is material, and constitutional error results from its suppression by the government, `if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v. Whitley (1995), 514 U.S. 419, 433-434,115 S.Ct. 1555, 131 L.Ed.2d 490, citing United States v. Bagley (1985),473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481. A "reasonable probability" of a different result is demonstrated when the government's suppression of evidence "undermines the confidence in the outcome of the trial." Id. at 434.
 {¶ 71} In the present case, the prosecutor disclosed the information about the warrantless search during the trial, and the court provided the defense an opportunity to address the issue at that time. Defense counsel reasonably determined that a suppression hearing was unnecessary. We find no reasonable probability the outcome of the trial would have been different if the prosecutor had disclosed the information earlier. (Although bad faith is not a factor in theBrady analysis, we note that the record reflects no bad faith on the part of the prosecutor, and we commend his public apology to the court and defense counsel for his failure to disclose the information previously.)
 {¶ 72} Next, Harris argues that the prosecutor engaged in misconduct by failing to have *Page 21 
Hodge, Johnson, Brian Adams, and Honore's next-door neighbor testify at trial. Harris asserts that he "could have used these witnesses for the defense had they not been listed as prosecutor's witnesses." Nothing required the state to present these witnesses, and nothing prevented Harris from calling these witnesses as defense witnesses when the state failed to call them. This allegation of misconduct is without merit.
 {¶ 73} Harris further argues that the prosecutor acted improperly when he introduced the rifle into evidence when there was no evidence that the weapon was used in the offenses. Although the evidence indicates that the rifle was not used in the offenses, we find no basis to conclude that the outcome of this case was affected by the admission of the rifle into evidence. The prosecutor acknowledged during opening statements that the rifle was not tied to Harris, and the state's evidence indicated that Harris's fingerprints were not on the rifle and that the recovered bullets were not fired from that gun. We see no misconduct in the prosecutor's use of the rifle.
 {¶ 74} Harris also claims that the prosecutor used an altered 911 tape during trial. As stated above, we find no evidence that the prosecutor used an altered 911 tape.
 {¶ 75} Finally, Harris contends that the prosecutor wrongfully asked the jury to infer that Harris discarded the gun during the seven minutes, fifty-two seconds between Adams's 911 call and when the police responded to the residence. Because Adams testified that Harris had shot at him yet the weapon used in the offenses was not found, the prosecutor reasonably argued based on the evidence that the jury should infer that Harris had discarded the weapon in that time period.
 {¶ 76} In short, we find no support for Harris's assertion that the prosecutor engaged in *Page 22 
misconduct. The sixth assignment of error is overruled.
 VII {¶ 77} Harris's fourth assignment of error states:
 {¶ 78} "DEFENDANT/APPELLANT, RECEIVED THE MAXIMUM SENTENCE ON TWO SEPARATE COUNTS. THUS THE TRIAL COURT ERRED AND VIOLATED THE DEFENDANT['] S CONSTITUTIONAL RIGHTS, AND FAILED TO COMPLY WITH THE OHIO SENTENCING GUIDELINES, WHEN IT IMPOSED THIS MAXIMUM SENTENCE."
 {¶ 79} In Harris's fourth assignment of error, Harris claims that the trial court erred in imposing the maximum sentence for felonious assault and for improperly discharging a firearm at or into a habitation, both second degree felonies. Harris asserts that the maximum sentence that the judge could impose with a jury finding that he had committed the worst form of the offense of felonious assault was seven years.
 {¶ 80} At sentencing, the court concluded that the four counts of felonious assault were allied offenses of similar import, and the state chose to proceed on count one. The court also found that the firearm specifications merged. Harris was sentenced to eight years on count one (felonious assault), to three years for the firearm specification, to eight years on the improperly discharging a firearm into a habitation count, and to one year on each count of having weapons while under disability. The sentences for felonious assault, improperly discharging the firearm into a habitation, and one of the counts of having weapons while under disability were to be served concurrently. The three-year firearm specification was to be served consecutively to the felonious assault sentence, and the one-year sentence for the second count of having weapons while under disability was consecutive to the other sentences. Harris received an aggregate *Page 23 
sentence of twelve years in prison plus a fine of $300.
 {¶ 81} In State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856,845 N.E.2d 470, the Supreme Court of Ohio found several provisions of the sentencing statute to be unconstitutional, and it severed them from the sentencing statute. The severed statutes included R.C. 2929.14(B), which related to nonminimum sentences, R.C. 2929.14(E)(4), which related to consecutive sentences, and R.C. 2929.14(C), which related to maximum sentences. Since Foster, trial courts have had full discretion to impose a sentence within the statutory range without the need for findings or reasons for imposing maximum, consecutive, or greater than minimum sentences. Courts must still consider R.C. 2929.11 and R.C. 2929.12.State v. Mathis, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38.
 {¶ 82} Under R.C. 2929.14(A), the maximum prison term for a second degree felony is eight years. We find no error in the trial court's imposition of an eight-year sentence for felonious assault or improperly discharging a firearm at or into a habitation.
 {¶ 83} The fourth assignment of error is overruled.
 {¶ 84} Having overruled each of Harris's assignments of error, the judgment will be affirmed.
 BROGAN, J. and GRADY, J., concur. *Page 1